IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

DAVID N. GRASS,

     Plaintiff,

vs.

                          No. CIV 02cv155 PK/LFG-ACE

ALBUQUERQUE PUBLIC
SCHOOLS, Board of Education of the
Albuquerque Public Schools d/b/a Rio
Grande High School,

     Defendant.

MEMORANDUM OPINION AND ORDER

THIS MATTER comes on for consideration of Defendant's Motion for
Summary Judgment filed April 2, 2003 (Doc. 49), and Defendant Albuquerque
Public Schools' Motion to Strike Affidavit of David Grass filed May 5, 2003
(Doc. 59).  Upon consideration thereof,

(1)  Summary Judgment Standard.  Summary judgment is appropriate when
"there is no genuine issue as to any material fact and . . . the moving party is
entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A movant is
responsible for identifying the basis of its motion, which it may support with
material demonstrating the absence of a genuine issue of material fact.  Celotex
Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Here, Defendant Albuquerque Public

Schools ("APS") contends that under the Americans with Disabilities Act, 42 U.S.C. §§ 12101-12213 ("ADA"): (1) Mr. Grass cannot establish that he is a qualified individual with a disability; (2) even if Mr. Grass could establish that he is a qualified individual with a disability, he cannot prove that his requested accommodation was necessary in order to perform the essential functions of his job; (3) APS cannot be held liable under the ADA because Mr. Grass repeatedly failed to engage in a good faith interactive process, (4) the accommodation requested by Mr. Grass was unreasonable as a matter of law, and (5) APS's enforcement of parking regulations precluding Mr. Grass from parking in his chosen place cannot constitute harassment or retaliation.  Mr. Grass contends that he has presented sufficient evidence to create a genuine issue of material fact concerning his disability status, reasonable accommodation, disability discrimination, and retaliation.  In opposing summary judgment, Mr. Grass cannot rest upon the pleadings, but "must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).

"One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses."  Celotex, 477 U.S. at 323-24.  When reviewing a motion for summary judgment, a court considers all evidence and reasonable inferences in the light most favorable to the non-movant; however, that material must contain probative evidence that would allow a trier of fact to find in favor of the non-movant.  Anderson v. Liberty Lobby, Inc., 477

U.S. 242, 249-50 (1986).  Disputes about immaterial facts will not preclude summary judgment.  Id. at 248.

APS has also filed a motion to strike Mr. Grass's affidavit submitted in response to its summary judgment motion.  Doc. 59.  Merely because an affidavit conflicts with deposition testimony is not, in and of itself, sufficient to exclude consideration of the affidavit.  Franks v. Nimmo, 796 F.2d 1230, 1237 (10th Cir. 1986).  However, where such an affidavit is an attempt to create a sham fact issue to defeat summary judgment, a court may disregard it.  Id.

> Factors relevant to the existence of a sham fact issue include whether the affiant was cross-examined during his earlier testimony, whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion which the affidavit attempts to explain.

Id.

(2)  Background.  Mr. Grass is a high school special education teacher who desired to park in an area that was closer to his assigned classroom than the handicapped parking spaces that were made available to him.  He brought this action under the ADA claiming that APS discriminated against him by denying him reasonable accommodation by not allowing him to park where he wanted, (count I, Complaint (Doc. 1) at 10), discriminated against him with "multiple acts of cruel harassment," (count II, id. at 11) and then retaliated against him (count III, id. at 11-12) based upon his filing an ADA claim with the EEOC.  According

to APS, parking is not allowed in the area where Mr. Grass wanted to park.  Doc. 54, Ex. E at 34.  APS contends that parking restrictions on the campus were for safety reasons, including pedestrian traffic and emergencies.  Id. at 11. According to campus security, the approach to enforcement was first to find the owner of the vehicle and ask him or her to move it.  Id. at 11-12.  That failing, a sticker was placed on the vehicle stating that "You are in violation of having parked near a fire lane.  Next time, please do not park here or you might be towed."  Id. at 12.  Repeat offenders would be stickered again, and ultimately had their cars towed or booted.  Id. at 12-13; see also Ex. C. at 81-82; Ex. R. at 15-16.  Despite warnings and his car being stickered, Mr. Grass continued to park in the restricted area, and his car was eventually towed.  Id., Ex. E at 34-36.  Mr. Grass continued to park in the restricted area even after his car had been ticketed, booted and towed.

Here is how it began.  On September 13, 2000, Mr. Grass sent a memo to the assistant principal setting out his medical condition and stating that "walking from handicapped parking at Rio Grande High School to my classroom is punishment."  Id., Ex. B.[1]  APS offered to relocate his classroom to a portable

---

[1]  Mr. Grass's complaint does not specify the nature of his impairments. His affidavit in response to the summary judgment motion states:

> I suffer from a number of long-standing medical conditions
> and diagnoses, including the complete degeneration of most or all of

(continued...)

classroom (T1) so he could park very close in a nearby handicapped parking space.  Although requested to respond in writing to this offer, Mr. Grass did not. Doc. 57, Ex. 5; Doc. 54, Ex. A at 85.  Mr. Grass testified on deposition that he had previously explained to APS that such a move was unacceptable for five reasons, including that it involved climbing stairs or negotiating ramps which neither he nor one of his students could do easily.  Doc. 54, Ex. A at 82-83.

In October 2000, Mr. Grass was requested to follow the school district's ADA procedures and was given requisite forms needed to (1) request accommodation, (2) document his disability, and (3) allow release of his medical information in case APS wanted clarification.  Id., Ex. F.  APS received the first form on December 6, 2000.  Id., Ex. A at 124-25.  APS requested the balance of the forms from Mr. Grass in December 2000 and in February 2001, id., Ex. I, although Mr. Grass was not working from mid-December 2000 until April 9, 2001 due first to winter break and then to recuperation from back surgery.  Id., Ex. A at 134-35.  In May 2001, Mr. Grass submitted the second form, with a date of October 2000, at an ADA grievance hearing.  Id. at 114, 269; id., Ex. D at

_____

[1](...continued)
the cartilage in both of my knees, the fusion of bones in my wrist, serious cardiovascular disease, and post traumatic stress disorder.

Doc. 57, Ex. 1 at 4-5.  See also Doc. 54, Ex. G (letters from health care providers indicating lower back pain and other conditions).

128.   Although Mr. Grass now claims in an affidavit that he provided the second form promptly to APS and APS lost it, Doc. 57, Ex. 1 at 15, this is inconsistent with his prior deposition testimony where he was questioned about his failure to provide the form in light of APS letters specifically requesting it, as well his documented responses to APS's repeated requests for the information.  Doc. 54, Ex. A at 113-14, 133,[2] 136, 267, 269.  Plainly, Mr. Grass had access to any facts about timely submission at his deposition where he was subject to cross examination.  Mr. Grass's affidavit testimony on this point should be disregarded as creating a sham fact issue.  It is particularly unfair to APS because discovery proceeded without a hint of this version.  It is uncontroverted that Mr. Grass never submitted the APS form for medical records release.  Id. at 112.

Rather than complying with the APS procedure for requesting reasonable accommodation, Mr. Grass submitted evidence of his Department of Veterans Affairs disability rating and letters from various medical providers identifying what conditions he suffered from and stating that he should be allowed to park

---

[2]  Q:  Between that time period of October through the end of the year, December, 2000, you never filled out the medical records release or those other forms that she had sent you to send them back to her.   Is that fair to say?

[Mr. Grass]: No, sir.  Yes, sir, it is fair to say.

Id., Ex. A at 133.

near his classroom.  Id., Ex. G.  He also objected to filling out the required

forms, stating that he had already provided federal, state and private medical

information and asking about "the legal precedent that requires that I make my

medical history an open book to my employer in order to secure that simple

accommodation of being able to park within a distance from my classroom that is

necessary given my inability to walk."  Id., Ex. J.  APS responded with a letter

from its disability coordinator stating that APS needed the second form

(documenting medical condition) to determine whether a disability existed, and if

so, what accommodation would be reasonable.  Id., Ex. K.  The letter also stated:

"Since this is the fourth time I have provided you with this direction, I can only

assume at this time that you are not interested in cooperating with the school

district in addressing your request."  Id.  According to the letter, APS would not

correspond further until the information was forthcoming.  Id.

Apparently, at the end of the 2001 school year, APS and Mr. Grass reached

a compromise--his wife would be allowed to drive in the restricted area to drop

him off and pick him up.  Id., Ex. L at 33-35; Ex. M at 75-76; Ex. N at 129-30.

Mr. Grass was not totally satisfied with this arrangement because it disrupted his

wife's schedule.  Doc. 57, Ex. 1 at 16.  The next academic year Mr. Grass was

moved to another classroom where at least parking next to his classroom was not

an issue.  Id.

(3)  ADA and a Prima Facie Case.  The ADA provides that no covered

employer "shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees . . . and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a). Discrimination includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity."  § 12112(b)(5)(A).  A "qualified individual with a disability" is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).  A "disability" is "a physical or mental impairment that substantially limits one or more of [an individual's] major life activities;" "a record of such an impairment;" or "being regarded as having such an impairment."  42 U.S.C. § 12102(2).  Here, the first definition applies.  <u>See</u> Complaint (Doc. 1) at 4, ¶¶ 17, 20, 35.

To establish a prima facie case of discrimination under the ADA, Mr. Grass must show (1) that he is disabled within the meaning of the ADA; (2) that he is qualified--with or without reasonable accommodation; and (3) that he was discriminated against because of his disability.  <u>MacDonald v. Delta Air Lines,</u>

Inc., 94 F.3d 1437, 1443 (10th Cir. 1996).  To establish a prima facie case of
failure to accommodate under the ADA, Mr. Grass must show that (1) he is a
qualified individual with a disability, (2) his employer had notice of the
disability, (3) that he could perform the essential functions of the job with
reasonable accommodation, but (4) the employer would not make such
accommodations.  Rhoads v. F.D.I.C., 257 F.3d 373, 387 n. 11 (4th Cir. 2001).
Thus, to prevail on his claims of a failure to accommodate (count I) and disability
discrimination based upon multiple acts of harassment (count II), Mr. Grass must
show that he is disabled within the meaning of the ADA.

(4) ADA and the Meaning of "Disabled."  Whether an individual is
considered disabled under the first definition depends upon (1) whether the
individual has an impairment; (2) identifying the life activities the individual
claims to be affected by the impairment and determining whether they constitute
"major life activities" under the ADA; and (3) determining if the impairment
substantially limits the major life activity.  Bragdon v. Abbott, 524 U.S. 624,
632, 637, 639 (1998); Doyal v. Oklahoma Heart, Inc., 213 F.3d 492, 495-96 (10th
Cir. 2000).  Steps (1) and (2) are legal determinations for the court; step (3) is
factual.  Bristol v. Bd. of County Comm'rs of the County of Clear Creek, 281
F.3d 1148, 1157-61 (10th Cir.), vacated in part on other grounds, 312 F.3d 1213,
1221 (10th Cir. 2002) (en banc).

(5) Plaintiff's Impairments and Major Life Activities Involved.  Plaintiff is

responsible for identifying the impairments and major life activities involved.
Poindexter v. Atchison, Topeka & Santa Fe Ry. Co., 168 F.3d 1228, 1230 (10th
Cir. 1999).  As noted, Plaintiff lists his impairments as the complete degeneration
of most or all of the cartilage in both of his knees, the fusion of bones in his
wrist, serious cardiovascular disease, and post traumatic stress disorder.  Doc. 57,
Ex. 1 at 4-5.  He also reports back pain.  Doc. 54, Ex. G.  It appears that the
major life activity involved is "his ability to walk substantial distances."
Complaint (Doc. 1) at 3, ¶ 14.  Walking has been defined by the regulations as a
major life activity.  29 C.F.R. § 1630.2(i); see also Toyota Motor Mfg., Ky., Inc.
v. Williams, 534 U.S. 184, 197 (2002).

(6) Impairments Must Substantially Limit Major Life Activities.  Even
assuming the impairments and major life activity as set forth by Mr. Grass, he
would have the burden of establishing that his impairments substantially limit his
ability to walk.  For a physical or mental impairment to qualify as a "substantial
limit" on a major life activity, an individual must be:

> (i) Unable to perform a major life activity that the average person in
> the general population can perform; or
> (ii) Significantly restricted as to the condition, manner or duration
> under which an individual can perform a particular major life
> activity as compared to the condition, manner, or duration under
> which the average person in the general population can perform that
> same major life activity.

29 C.F.R. § 1630.2(j)(1).  In determining whether an individual is substantially
limited in a major life activity, one should consider the nature and severity of the

-10-

impairment, the length of time the impairment has lasted or is expected to last, and the expected permanent and/or long term impact of the impairment. 29 C.F.R. § 1630.2(j)(2). The inquiry is specific to the individual, and a person's ability to compensate for the impairment is highly relevant. Albertson's, Inc. v. Kirkingburg, 527 U.S. 555, 565-66 (1999).

In his summary judgment response, Mr. Grass relies upon various letters written by doctors at his request recommending that he be allowed to park close to his classroom. Doc. 57 at 4-5; Doc. 54, Ex. G. These letters identify various conditions that Mr. Grass suffers from (peripheral vascular disease, coronary artery disease, hypertension, degenerative arthritis involving back and knees) and symptoms reported by him (history of lower back and knee pain). Doc. 54, Ex. G. They lack supporting documentation, and in the main they do not address the nature, extent and duration of his impairments. See id., Ex. D at 126-27; Ex. H (Defendant's Expert Report). Mr. Grass responds by stating that it is undisputed that he has pain when he walked, and that APS never advanced reasons why it needed additional information concerning the effects of the impairments on walking distance and his ability to perform his job. Doc. 57, Ex. 1 at 13-14. The persistent theme in Mr. Grass's summary judgment response is that he provided APS sufficient information, and APS then had the burden to justify any additional information it needed. APS correctly points out that more is necessary to withstand summary judgment.

It is entirely proper to look at what activities Mr. Grass has performed, notwithstanding Mr. Grass's claim, id. at 17, that he cannot walk more than 100 feet without pain.  See Toyota Motor, 524 U.S. at 201-02.  Looking at the summary judgment evidence submitted by both parties in the light most favorable to Mr. Grass, these activities include: (1) walking at least 500 feet during a functional capacity evaluation; (2) participation in a motorcycle training course with a motorcycle weighing less than 200 pounds; (3) riding a Harley Davidson touring motorcycle outfitted with a back brace and leg pegs to minimize back pain; and (4) coaching high school varsity football, but driving to the football field, using a cane or walking stick for support, and changing positions every 15 minutes.  Doc. 54, Ex. A at 16-17, 30, 198-201; Ex. L at 42-43; Doc. 57, Ex. 1 at 5, 17.  An APS witness observed him walking the campus taking photographs of the restricted parking area;[3] he disputes this, claiming that the photographs he submitted were taken right outside his classroom and that he drove to take more distant photographs.  Doc. 54, Ex. P at 32, 36; Doc. 57, Ex. 1 at 7, 17.  Additionally, Mr. Grass's doctors recommended that he walk, although Mr. Grass disputes his admission of this by claiming that the doctors meant 50-100 feet.

---

[3] Mr. Grass has a collection of over 500 photographs of various cars in the restricted area.  Doc. 57, Ex. 1 at 7.  He took the pictures, though on some occasions either his wife or students he recruited for the task would do so.  Id.; Doc. 54, Ex. A at 269; id., Ex. P at 29-30.  He continued to take pictures even after he was not teaching at the high school in question.  Doc. 57 at 5-6; id., Ex. 1 at 7; Doc. 54, Ex. P at 25-26.

Doc. 54, Ex. A at 138-40; Ex. Q (Dr. Black); Doc. 57, Ex. 1 at 18.

In the Tenth Circuit, only if an impairment is substantially limiting on its face may a plaintiff dispense with comparative evidence concerning the general population's characteristics concerning the major life activity in question, here walking.  Lusk v. Ryder Integrated Logistics, 238 F.3d 1237, 1240-41 (10th Cir. 2001).  In this case, there is none.  To conclude that the various conditions that Mr. Grass complains of are substantially limiting on their face would do away with the careful inquiry required by the ADA based upon individual assessment.  See Toyota Motor, 534 U.S. at 199 ("An individualized assessment of the effect of an impairment is particularly necessary when the impairment is one whose symptoms vary widely from person to person.").  Mr. Grass's opinion that his knee and cardiovascular conditions are obvious to anyone because he limps and is out of breath easily, Doc. 57, Ex. 1 at 5, simply cannot substitute for objective medical evidence that addresses the effects of these impairments on Mr. Grass's ability to walk within the context of his job.  In Steele v. Thiokol Corp., 241 F.3d 1248, 1254 (10th Cir. 2001), the Tenth Circuit rejected a claim that Obsessive-Compulsive Disorder substantially limited a plaintiff's ability to walk given that the the the plaintiff "is still physically and psychologically capable of walking."  Here, it appears that Mr. Grass was physically and psychologically able to walk, and his claim that he is substantially limited in an ability to walk long distances has never been quantified by him within the context of this suit

-13-

and the general population.

(7) Failure to Accommodate Claim.  In the alternative, summary judgment is warranted on Mr. Grass's failure to accommodate claim for several reasons. Where an employer has a duty to make reasonable accommodations, such employer "is not required to always provide the employee with the best possible accommodations or in the specific manner the employee requested."  Selenke v. Med. Imaging of Colo., 248 F.3d 1249, 1261 (10th Cir. 2001).  The employer "has broad discretion" in its choice among alternative accommodations.  Id. Thus, APS was not required to allow Mr. Grass to park each and every full working day in the restricted area near his classroom given other alternatives.

The accommodation process is an interactive one, requiring cooperation from the employer and employee, and is designed to "identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations."  29 C.F.R. § 1630.2(o)(3); Templeton v. Neodata Servs., Inc., 162 F.3d 617, 619 (10th Cir. 1998).  As an employer, APS is permitted to make medical inquiries of employees that are job-related and consistent with business necessity.  42 U.S.C. § 12112(d)(4)(A), (B); 29 C.F.R. § 1630.14(c).  Section 1630.14(c) "permits employers . . . to make inquiries or require medical examinations necessary to the reasonable accommodation process."  29 C.F.R. Pt. 1630, App. § 1630.14(c); Martin v. Kansas, 190 F.3d 1120, 1133-34 (10th Cir. 1999), overruled on other grounds, Bd. of Trustees of

-14-

the Univ. of Ala. v. Garrett, 531 U.S. 356 (2001).

Mr. Grass did not provide APS the documentation of disability form in a timely manner and it is uncontroverted that Mr. Grass failed to provide APS with medical releases from his doctors.  In Templeton, the court held that where the employer needs the information to determine the appropriate reasonable accommodation, and the employee fails to provide it, the employer cannot be held liable for failure to accommodate.  162 F.3d at 619.  "An employer cannot be expected to propose reasonable accommodation absent critical information on the employee's medical condition and the limitations it imposes."  Id.  Just as in this case, the Templeton plaintiff refused to authorize her physician to release information.  Id. at 618.

Although Mr. Grass claims that he provided APS with more than enough medical information in his lay opinion, no reasonable trier of fact could so conclude.  Doc. 57, Ex. 1 at 12, 15.  His general contention contained in his response affidavit that he "offered repeatedly to enter into dialogue with APS officials," and "asked them what more they needed to understand my disability and need for accommodation," id. at 12, does not address his documented refusal to provide the necessary information after repeated requests from APS.  Doc. 54, Ex. D at 95-97, 104, Exs. I & K.  He states: "I would have been more than happy to deal with my physicians on a request-by-request basis to provide information that APS legitimately needed."  Doc. 57, Ex. 1 at 12.  His willingness to

cooperate was limited by his concern that APS not be allowed unrestricted access to his medical records even insofar as they pertained to his impairments.

Mr. Grass claims that he should have a right of privacy in his medical records and that he should be able to seek other ways to provide APS with the medical documentation it required.  Id. at 12-13.  Apparently, for this lawsuit, Mr. Grass was required to release records concerning his mental illness history and involuntary commitment and he does not think the information was used appropriately by counsel for APS.  Id.  That fact is irrelevant; moreover, the APS release form did allow Mr. Grass to list the applicable medical conditions covered and requests the name of the physician or other diagnostic professional from whom the information is sought.  Doc. 54, Ex. O; Ex. D at 138-39.  Mr. Grass argues that the APS release form is overbroad because it "does not allow restriction as to what records are requested or what medical providers."  Doc. 57, Ex. 1 at 16.  Obviously, this presupposes Mr. Grass's screening the medical records, which is obviously unacceptable given the self-interest a claimant may have in the matter.  Mr. Grass's position is unreasonable as a matter of law; he cannot filter the information and then supply it to APS.

APS had a need for the information contained in the forms to learn the nature, extent and duration of the impairments as well as "the precise limitations resulting from the disability."  29 C.F.R. § 1630.2(o)(3).  The APS disability coordinator testified that APS policy was to request medical documentation

whenever ADA accommodation is requested, unless the requestor's physical limitation is "quite obvious."  Doc. 54, Ex. D at 67.  Although Mr. Grass contends that his impairment was obvious and yet he was required to provide medical documentation, Doc. 57, Ex. 1 at 13, the balance of the ADA coordinator's response is essential.  She illustrated the point by two examples: an employee that is physically limited to a wheelchair at all times and an employee that only has one arm.  Doc. 54, Ex. D at 67-68.  It is undisputed that Mr. Grass is able to walk and that his doctors recommended a walking regimen, but as the ADA coordinator for APS observed:

> [U]ntil May of 2001, my office never received enough medical information upon which to make the decisions about whether Mr. Grass had a bona fide disability and then to consider, if so, reasonable accommodations.
>
> As I stated a while ago, what we received were some statements of various lengths from two or more physicians . . . .  It looks like it would have been about four or five different people . . . but none of those were sufficient for making the kinds of decisions that we had to make.  They were reports, they were statements, they were some medical information and some statements implying, ["]you asked me to write this, Mr. Grass, so I'm saying this.  And I'm saying I think it's reasonable to give you this kind of accommodation.["]  We don't need for a physician or any other evaluator to tell us what is a reasonable accommodation.  That's a function for APS to sort out with its employees.  These doctors, to my knowledge, never set foot in Mr. Grass' work environment.  They're not in a position to judge that.  What we need from them is the kind of information that's in that form, the etiology of the condition, the duration, the other narrative information that's asked in question form on the first page, and then the rating of the essential functions of the person's job role.  That's what the ADA is all about, the person's ability to carry out the essential functions of his or her job with or without reasonable

accommodation.

Id. at 126-27.  The ADA coordinator also testified that the medical releases would have allowed APS to communicate with Mr. Grass's doctors to clarify what constituted "excessive walking" in terms of accommodation.  Id. at 142. The information APS needed was requested in the forms that Mr. Grass did not submit in a timely manner.  Even if Mr. Grass did submit the documentation of disability form promptly as he claims (which the court disregards as creating a sham fact issue), he could not sit back and ignore the repeated requests of APS to furnish  it--it would have been incumbent upon him to provide another copy.  Mr. Grass argues that there is an issue of material fact concerning the good faith of APS, but APS repeatedly explained why it needed the information and APS was not required to accede to Mr. Grass's unilateral decision on the form of medical information he would provide (letters solicited from his doctors), any more than it was required to let him park in the restricted area to the exclusion of any other accommodation.

APS also included evidence that Mr. Grass's claim that other teachers were given ADA accommodations without medical information lacks evidentiary support, and Mr. Grass's response to this (that the ADA coordinator did not require medical information if the impairment was obvious), is wholly inadequate to create a fact issue.  See Doc. 50, ¶ 23; Doc. 57 at 13.  In sum, the summary judgment evidence simply does not support any claim that the APS requests for

medical information simply were a pretext for disability discrimination, let alone a failure to accommodate.

In his affidavit, Mr. Grass claims that when he told a high school official that she would need to accommodate him under the ADA, "she replied in a hostile tone, 'no, I do not.'" Doc. 57, Ex. 1 at 6.  This occurred when Mr. Grass submitted his September 13, 2000 memo, at the beginning of this process and before the requests for medical information came from other APS officials who were handling his ADA claim.  Given the events that followed and the different decision makers in this case, this lone remark is insufficient to preclude summary judgment.

Mr. Grass has submitted summary judgment evidence indicating that APS provided an accommodation to him in the form of a stool after he returned from a work-related injury, without obtaining a medical release.  Doc. 57, Ex. 3 at 105. The APS coordinator testified that there was no need for additional information because it already had a functional capacity evaluation from a contractor.  Id. Under the ADA, the employer has discretion to request medical information as part of the reasonable accommodation process, and there simply is no evidence in this case suggesting that the request by APS for medical information concerning Mr. Grass's request for alternative parking was made in bad faith or was oppressive.

In May 2001, the high school administration brokered a compromise to this

problem.  Mr. Grass was furnished a reasonable accommodation which he

apparently accepted--his wife was allowed to deliver him and pick him up near

his classroom.  Although delay in providing a reasonable accommodation may

violate the ADA, the long delay in this case was a product of Mr. Grass's

insistence upon parking only in a restricted area near his classroom and his

unwillingness to provide medical information in a timely manner that would have

allowed APS to evaluate this case.  See Selenke, 248 F.3d at 1262-64.  Although

the court is convinced that presence at school is an essential function of most

teaching jobs, and that reasonable accommodation of a qualified individual with a

disability includes access to the classroom, this can be accomplished in a variety

of ways.  See Lyons v. Legal Aid Society, 68 F.3d 1512, 1515-16 (2d Cir. 1995).

Mr. Grass did not allow the process to work as intended and APS cannot be held

responsible.  See Templeton, 162 F.3d at 619; Tyler v. Ispat Inland Inc., 245 F.3d

969, 974 (7th Cir. 2001).

    (8)  Disability Discrimination Claim.  Even assuming that Mr. Grass could

make a prima facie case, and that APS's enforcement of its parking restrictions

constitutes adverse action, APS has offered legitimate non-discriminatory reasons

for its actions, and Mr. Grass's evidence of pretext is insufficient to create a

genuine issue of material fact.  See Rakity v. Dillon Cos., 302 F.3d 1152, 1164

(10th Cir. 2002) (discussing burden-shifting framework in ADA discrimination

cases).  In his complaint, Mr. Grass contends that he was subject to multiple acts

of harassment. The court agrees with APS that the basis of this claim is that APS refused to accede to his demand to park in the restricted area for entire work days and enforced its parking policy. Doc. 50 at 7, ¶ 24; Doc. 57 at 13; id., Ex. 1 at 19. There is no genuine issue of material fact that the area was restricted, notwithstanding the statement of one witness that it was not a restricted area and it was not illegal to park there because other people were parking there. Doc. 57, Ex. 2 at 14, 16, 27. Even Mr. Grass acknowledges that other teachers received warning stickers, were parked illegally, and at least one received a ticket. Doc. 57, Ex. 1 at 7, 8 ("Victor Gonzales was ticketed, but never towed or booted.").

Mr. Grass claims that "among faculty and staff, no one except me was ever booted or towed." Id. at 7. And he has submitted deposition testimony from APS staff that two teachers parked by portable buildings (Victor Gonzales and Sherry Rios) without being towed or booted, as well as other cars present in the area. Doc. 57, Ex. 2 at 14, 22; Ex. 4 at 71.

The summary judgment evidence is uncontroverted that Mr. Grass was warned repeatedly not to park there, and continued to park there even after oral and written warnings, followed by being booted and towed. Doc. 54, Ex. C at 83 (assistant principal); Ex. E at 34-36 (campus security aide); Ex. P at 24-25 (Mr. Grass's assistant); Ex. W at 9-10 (special education teacher). Certainly APS may make judgments concerning the need for a restricted parking area for reasons of safety and exercise discretion with respect to enforcement, provided that it does

so in a non-discriminatory fashion.  Here, the evidence establishes that (1) although temporary loading and unloading was permitted, parking for the full duty day was not, and (2) others were subject to the APS progressive enforcement policy which was administered by several security aides sometimes in consultation with the administration.  See, e.g., Doc. 54, Ex. P at 9; Ex. R at 21-22; Ex. S; Ex. T at 14-15; Ex. W at 9-10; Ex. X at 5; Ex. AA at 22-24.  The fact that not *all* violators of the parking policy were subjected to being towed or booted simply does not confer upon Mr. Grass a right to park in the restricted area any more than lax enforcement of the laws regulating controlled substances would permit one to violate those laws without punishment.  Nor does the fact that cars were observed parked in the restricted area constitute significantly probative evidence that Mr. Grass was singled out for enforcement because of a disability or an ADA claim.

Essentially, Mr. Grass would claim that unless the parking policy was enforced to the exclusion of all vehicles in the area, it would be discriminatory to enforce the restriction on full-day parking against him.  A complete ban might be the better policy to effectuate APS goals of pedestrian safety and emergency access, but the law does not allow a federal court to superimpose an enforcement scheme on APS in the name of the ADA.  APS could permissibly consider the effect of Mr. Grass's requested accommodation on the operation of its facility, and choose to enforce its parking regulations.  29 C.F.R. § 1630.2(p)(2)(v).  Mr.

Grass has not demonstrated that APS's legitimate, non-discriminatory reason for its actions, i.e., enforcement of its parking restrictions for safety and emergency concerns, are pretextual.  See Bullington v. United Air Lines, Inc., 186 F.3d 1301, 1317 (10th Cir. 1999).  After all, "[t]he relevant inquiry is not whether [the employer's] proffered reasons were wise, fair or correct, but whether [the employer] honestly believed those reasons and acted in good faith upon those beliefs."  Id. at 1318.

(9) Retaliation Claim.   To establish a prima facie case of retaliation under the ADA, Mr. Grass was required to show: (1) that he engaged in protected activity; (2) that he was subjected to adverse employment action contemporaneous with or subsequent to the protected activity; and (3) a causal link between the adverse action and the protected activity.  42 U.S.C. § 12203(a); Selenke, 248 F.3d at 1264.  Mr. Grass is not required to prove that he is disabled; he need only establish a reasonable and good-faith belief that the ADA was violated.  Selenke, 248 F.3d at 1264.  Again, even assuming that Mr. Grass could establish a prima facie case, APS has articulated legitimate non-discriminatory reasons for the actions it took and Mr. Grass has not created a genuine issue of material fact showing those reasons are pretextual.  See id.

Mr. Grass relies upon a set of handwritten notes kept by the ADA coordinator for APS as evidence suggesting retaliation.  According to Mr. Grass, the fact that the ADA coordinator had a set of handwritten notes concerning the

-23-

chronology of this case (including his EEOC filing activity) demonstrates that the filing activity was prominent in her thinking.  He also contends without citation to the record that these notes make reference to the ADA coordinator being involved in incidents involving the towing of Mr. Grass's vehicle.  Doc. 57 at 17. The fact that the ADA coordinator would make notes concerning the chronology of this case creates no inference whatsoever of a retaliatory motive--what professional does not take notes?  The fact that the notes may reference towing is equally benign given the facts of this case.  The retaliation claim is without support.

 NOW, THEREFORE, IT IS ORDERED:

 (1)  That Defendant's Motion for Summary Judgment filed April 2, 2003 (Doc. 49), is granted.

 (2)  That Defendant Albuquerque Public Schools' Motion to Strike Affidavit of David Grass filed May 5, 2003 (Doc. 59), is granted in part insofar as the court disregards certain portions of the affidavit (that are material to deciding the motion for summary judgment) as discussed in this memorandum opinion.

 (3)  That the July 21, 2003 pretrial conference and December 8, 2003 jury trial setting are vacated.

DATED this <u>10th</u> day of July 2003, at Santa Fe, New Mexico.

_____
United States Circuit Judge
Sitting by Designation

Counsel:
Dennis W. Montoya, Montoya Law, Inc., Albuquerque, New Mexico, for
Plaintiff.

Alex C. Walker and Max J. Madrid, Modrall, Sperling, Roehl, Harris & Sisk,
P.A., Albuquerque, New Mexico, for Defendant.